Appeal No. 23-2309

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

FLOR I. ARRIAZA DE PAREDES and
FRANCISCO HERNAN TEJADA LOPEZ,
*Plaintiffs-Appellants*,

v.

ZEN NAILS STUDIO LLC; PHONZ NGUYEN and
LIHN NGUYEN,
*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

## BRIEF FOR METROPOLITAN WASHINGTON
## EMPLOYMENT LAWYERS ASSOCIATION
## AND PUBLIC JUSTICE CENTER AS *AMICI CURIAE* IN
## SUPPORT OF APPELLANTS AND FOR REVERSAL

_____

Stephen B. Pershing
Fourth Circuit Bar No. 62418
Kalijarvi, Chuzi, Newman & Fitch, P.C.
818 Connecticut Ave., N.W., Ste. 1000
Washington, D.C. 20006
(202) 331-9260
spershing@kcnlaw.com

Alan R. Kabat
Fourth Circuit Bar No. 46823
Bernabei & Kabat, PLLC
1400 16th Street, N.W., Ste. 500
Washington, D.C. 20036
(202) 745-1942
kabat@bernabeipllc.com

Counsel to *Amici Curiae*

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . ii

Statement of Interest of *Amici* . . . . . . . 1

Argument . . . . . . . . . . 2

I. Fee determinations under fee-shifting statutes are required
to use market rates . . . . . . . . 2

II. The relevant market rates are defined by the actual legal
services market . . . . . . . 7

III. No judicial supposition or presumption of reasonableness
can substitute for evidence of current market rates for
legal services . . . . . . . . 8

IV. It is unacceptable under our precedents to cap fees at rates
unadjusted in over a decade . . . . . 11

Conclusion . . . . . . . . . 16

Certificate of Service . . . . . . . . 18

Certificate of Word Count . . . . . . . 18

# TABLE OF AUTHORITIES

**Cases**

*Astornet Techs., Inc. v. BAE Systems, Inc.*,
 201 F. Supp. 3d 721 (D. Md. 2016) . . . . 13

*Blum v. Stenson*,
 465 U.S. 886 (1984) . . . . . . . 3, 4, 8

*Denton v. Pennymac Loan Servs., LLC*,
 252 F. Supp. 3d 504 (E.D. Va. 2017) . . . . 7

*Doe v. Kidd*,
 656 F. App'x 643 (4th Cir. 2016) . . . . . 4

*Eastern Associated Coal Corp. v. Director, U.S. Office of Workers
 Comp. Programs*, 724 F.3d 561 (4th Cir. 2013) . . 4

*EEOC v. Freeman*,
 126 F. Supp. 3d 560 (D. Md. 2015) . . . . 5

*Grissom v. Mills Corp.*,
 549 F.3d 313 (4th Cir. 2008) . . . . . 6-7

*Harwood v. American Airlines, Inc.*,
 37 F.4th 954 (4th Cir. 2022) . . . . . 13

*Hensley v. Eckerhart*,
 461 U.S. 424 (1983) . . . . . . . 4-5, 6

*In re Creative Hairdressers, Inc. et al.*,
 No. 20-14583-TJC, Doc. 793 (Bkr. D. Md. Dec. 22, 2020) 5

*Johnson v. Georgia Highway Express, Inc.*,
 488 F.2d 714 (5th Cir. 1974) . . . . . 6

*Life Techs. Corp. v. Life Techs. Corp.*,
No. 10-cv-3527, 2012 WL 4748080 (D. Md. Oct. 2, 2012)     13

*Newport News Shipbuilding & Dry Dock Co. v. Brown*,
376 F.3d 245 (4th Cir. 2004)     .     .     .     .     .     13

*Perdue v. Kenny A.*,
559 U.S. 542 (2010)     .     .     .     .     .     .     . 2-3, 78

*Plasterers' Local Union No. 96 Pension Plan v. Perry*,
711 F. Supp. 2d 472 (D. Md. 2010)     .     .     .     .     12

*Plyler v. Evatt*,
902 F.2d 273 (4th Cir. 1990)     .     .     .     .     . 3, 7, 8

*Rum Creek Coal Sales, Inc. v. Caperton*,
31 F.3d 169 (4th Cir. 1994) .     .     .     .     .     .     6

*Salazar v. District of Columbia*,
809 F.3d 58 (D.C. Cir. 2015)     .     .     .     .     .     14

*Stone v. Thompson*,
164 F. Supp. 2d 639 (D. Md. 2001)     .     .     .     .     13

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
549 U.S. 311 (2007)     .     .     .     .     .     .     . 7

## Statutes and Rules

U.S. Dist. Ct., D. Md., Local Rules, App. B     .     .     .     9, 11

## Other Authorities

*Monopsony*, Oxford English Dictionary (online ed. 2024)     .     . 7

Senate Report No. 94-1011 (June 29, 1976),
*reprinted in* 1976 U.S.C.C.A.N. 5908     .     .     .     . 4-5, 6

## STATEMENT OF INTEREST OF *AMICI*

The Metropolitan Washington Employment Lawyers Association
("MWELA"), founded in 1991, is a professional association and is the
local chapter of the National Employment Lawyers Association, a
national organization of attorneys who specialize in employment law.
MWELA conducts continuing legal education programs for its more
than 300 members, including an annual day-long conference which
usually features one or more judges as speakers. MWELA also
participates as *amicus curiae* in important cases in the federal and
state courts of the District of Columbia, Maryland, and Virginia, the
three jurisdictions in which its members primarily practice. Because the
outcome of this case will directly impact the ability of MWELA
members to take cases on behalf of Maryland workers, MWELA has an
interest in the fair resolution of the issues presented in this appeal.

The Public Justice Center ("PJC"), founded in 1985 and based in
Baltimore, Md., is a public interest litigation and advocacy organization
committed to anti-poverty, anti-discrimination, and anti-racism work in
Maryland and beyond. Its litigation advocates for a more just society
through direct client representation and *amicus* participation. The PJC

has a longstanding commitment to ensuring a robust private attorney general scheme to increase access to courts for its client communities enforcing their civil rights in work, housing, education, health care, and other areas.

Both MWELA and PJC, and their clients, have an important interest in the provision of attorneys' fees in civil rights fee-shifting cases, and in the fairness and adequacy of fee awards in such cases, in all the federal courts in which they appear, particularly including the U.S. District Court for the District of Maryland.

## ARGUMENT

### I.  Fee determinations under fee-shifting statutes are required to use market rates.

As litigation under the federal fee-shifting statutes has developed over the past half-century, it has become ever clearer that fees must be based on the "lodestar," *i.e.*, "the number of hours worked multiplied by the prevailing hourly rates." *Perdue v. Kenny A.*, 559 U.S. 542, 546 (2010). The lodestar must be based on current rates in the relevant market for legal services in federal cases. *Id.* at 554-55. *Perdue* explicitly addressed the question that concerns us when it held that adjustments to the lodestar should be made so that "an attorney is

compensated at the rate that the attorney would receive in cases not governed by the federal fee-shifting statutes." *Id.* at 555. The Supreme Court continued: "[I]n order to provide a calculation that is objective and reviewable, the trial judge should adjust the attorney's hourly rate in accordance with specific proof linking the attorney's ability to a prevailing market rate." *Id.*

The Fourth Circuit has explained what evidence is relevant to this inquiry as follows: "In addition to the attorney's own affidavits, the fee applicant must produce satisfactory 'specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award.'" *Plyler v. Evatt*, 902 F.2d 273, 277-78 (4th Cir. 1990), *quoting Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir. 1987), which in turn quoted *Blum v. Stenson,* 465 U.S. 886, 895 (1984)). The *Plyler* Court continued: "Although the determination of a 'market rate' in the legal profession is inherently problematic, as wide variations in skill and reputation render the usual laws of supply and demand largely inapplicable, . . . the Court has nonetheless emphasized that market rate should guide the fee inquiry." *Id., citing Blum*, 465 U.S. at 895-96 n. 11.

This Court has cited *Plyler v. Evatt* many times, and has repeatedly explained that "competent evidence" of market rates is typically the affidavits of counsel who practice in the relevant market. *See, e.g., Doe v. Kidd*, 656 F. App'x 643, 654 (4th Cir. 2016) ("The evidence we have deemed competent to show prevailing market rates includes 'affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community'"), *quoting McAfee v. Boczar*, 738 F.3d 81, 91 (4th Cir. 2013)); *Eastern Associated Coal Corp. v. Director, U.S. Office of Workers Comp. Programs*, 724 F.3d 561, 571-73 (4th Cir. 2013).

Civil rights lawyers should not be left on the outside of the legal services market looking in. There is no second tier for civil rights plaintiffs that is lower than overall market rates. *Blum*, 465 U.S. at 894-95; *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). The goal of fee-shifting is to incentivize lawyers just as much to take these cases as others that pay market rates, since fee awards should correspond to fees "in other types of equally complex Federal litigation, such as antitrust cases," and "counsel for prevailing parties should be paid, as is traditional with attorneys compensated by fee-paying clients, for all

time reasonably expended on a matter." *See* Senate Report No. 94-1011, at 6 (June 29, 1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5913 (committee report on fee-shifting statute, 42 U.S.C. § 1988). Therefore, a "prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Hensley*, 461 U.S. at 429 (quoting Senate Report No. 94-1011, at 4, 1976 U.S.C.C.A.N. at 5912).

It would be ironic for the District of Maryland's Appendix B rates to "define" the market for prevailing civil rights plaintiffs' counsel even when it places no such thumb on the market scales for defense attorneys in employment cases. *See, e.g.*, *EEOC v. Freeman*, 126 F. Supp. 3d 560, 575-76 (D. Md. 2015) (awarding employment defense counsel hourly rates of $65 to $80 above the Appendix B guidelines); *In re Creative Hairdressers, Inc. et al.*, No. 20-14583-TJC, Doc. 793 (Bkr. D. Md. Dec. 22, 2020) (granting 100% of fees sought, including partner rates of $840 and $850 per hour, for large employer-side firm's defense services on employment issues) (order attached hereto as Exhibit 1, with the motion it granted).

The court below made at least one further error that calls urgently

for correction: it decided that Appendix B rates could not be exceeded if the case for which fees were sought was "not particularly novel or complex." Dist. Ct. Op. at 5, JA809.

It is true that the "novelty and difficulty of the questions raised" is one factor among 12 listed in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714, 718 (5th Cir. 1974) (interpreting this to refer specifically to cases of first impression). However, victories in first-impression cases are not the only litigation for which counsel fees at prevailing market rates are presumptively appropriate. *Hensley*, 461 U.S. at 429 ("a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust") (quotation marks omitted), *quoting* S. Rep. No. 94-1011 at 4 (1976).

Furthermore, the *Johnson* factors, including novelty or difficulty, are typically used to aid determinations of the reasonable number of hours, not determinations of a reasonable hourly rate, since the latter is determined by the market. *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994) (*Johnson* factors used "[i]n determining the reasonableness of the number of hours" claimed, whereas rates are to be determined under *Hensley* based on the relevant market); *Grissom*

*v. Mills Corp.,* 549 F.3d 313, 321 (4th Cir. 2008) (requiring evidence that the requested rates "align with prevailing rates" in the relevant market, without reference to any *Johnson* factor*), citing Plyler*, 902 F.2d at 277*; Blum,* 465 U.S. at 895 & n. 11 (suggesting that application of *Johnson* factors should not yield a below-market hourly rate); *cf. Denton v. Pennymac Loan Servs., LLC*, 252 F. Supp. 3d 504, 518 (E.D. Va. 2017) (using *Johnson* factors most analogous to *Hensley*, but determining in the case before it that novelty, difficulty, and skill required were all "neutral factors" in assessing the relevant market).

## II.    The relevant market rates are defined by the actual legal services market.

Just as a monopoly, a situation with many buyers but only one seller or provider, distorts the market, so too does its opposite, a "monopsony," an economic structure in which there are many sellers or providers but only one buyer. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 311, 320-321 (2007).[1]

---

[1] *See also Monopsony*, Oxford English Dictionary (online ed. 2024), https://www.oed.com/search/dictionary/?scope=Entries&q=monopsony (last visited August 4, 2024), citing Joan Robinson, *The Economics of Imperfect Competition* 215 (1933) (first proposing the term for the relationship formerly called "buyer's monopoly").

To avoid the distortion—indeed the circularity—of turning courts into monopsonists, fee-shifting doctrine has never treated court decisions themselves as creating the relevant market, but has instructed courts to refer to real legal services markets external to the fee-shifting world. *Perdue*, 559 U.S. at 551 ("the lodestar looks to the prevailing market rates in the relevant community"); *Blum*, 465 U.S. at 895 ("reasonable fees … are to be calculated according to the prevailing market rates in the relevant community"); *Plyler*, 902 F.2d at 278 ("the [Supreme] Court has … emphasized that market rates should guide the fee inquiry").

The District Court here defied that long-standing recognition, making its opinion the more grievously erroneous. Dist. Ct. Op. at 5, JA809 (opining that civil rights attorneys should expect rates no higher than those of Appendix B, since that was "the attorneys' expectation[ ] at the outset of the litigation").

### III.  No judicial supposition or presumption of reasonableness can substitute for evidence of current market rates for legal services.

The District Court was content to rely completely on Appendix B rates, calling them "presumptively reasonable," Dist. Ct. Op. at 3,

JA807, but it did not then accept any evidence for adjusting them—thus rendering the presumption conclusive.

When a District of Maryland court invokes Appendix B to decide a fee petition, does it first make findings that legal fees have not changed in the past ten years, when Appendix B was last updated in 2014? Does it first find that the evidence of market rates submitted by plaintiff or her counsel was not credible? The answer, in *amici*'s experience, is no. The District Court here and in numerous other cases has simply asserted that Appendix B applies.

The irony is that the Local Rule itself says that Appendix B is a guideline or starting point only:  "These rates are intended solely to provide practical guidance to lawyers and judges when requesting, challenging, and awarding fees." *See* U.S. Dist. Ct., D. Md., Local Rules, App. B, at 127 & note (July 1, 2023). Yet the federal courts in Maryland have been using Appendix B as a substitute for evidence ever since Appendix B came into being, a pattern of which the case on appeal is but one example. *See* Dist. Ct. Op. at 3-5, JA807-809.

It is past time for this Court to correct this accelerating "guideline creep." *Amici* believe that at most, Appendix B rates, if and only if

regularly adjusted for legal services cost inflation since their adoption
(see Part IV *infra,* 11-12), can serve the limited purpose for which they
were intended: they can be claimed by the party seeking fees without
submitting evidence about market rates, thereby streamlining fee
petitions and saving all parties and the courts time and effort. However,
*amici* urge that where a party seeks to demonstrate, using methods
respected by case law, that the actual market rates for that party's legal
fees are higher, then even an Appendix B-like rate table adjusted for
inflation should exert no weight or impact, and at most should be
viewed as a floor, not a ceiling. Any presumption of the reasonableness
of such rates as a cap should dissolve, and the court should turn to the
independent evidence presented without reference to them. In short,
once a fee petitioner submits admissible evidence in accordance with
case law, it is error to place more weight on even an inflation-adjusted
Appendix B than on evidence properly before the court, typically sworn
declarations from attorneys currently practicing in the relevant market.

This is because Appendix B is not "evidence" in any usual sense of
the term. Not only did the Appendix originate, as far as *amici*
understand, in an informal and unscientific snapshot survey of a few

Maryland lawyers whom the U.S. District Court asked for help in 1998 or earlier, but also, unlike court rules that merely establish procedures, Appendix B purports to substitute itself for adjudicative facts, an undertaking the District of Maryland itself understood was fraught with danger and should be strictly constrained: "The factors established by case law obviously govern over them [Appendix B rates]." *See* U.S. Dist. Ct., D. Md., Local Rules, App. B, at 127 & note (July 1, 2023).

Therefore, *amici* urge that it is both clear error and an abuse of discretion to give dispositive weight to Appendix B rates—even adjusted for inflation (*see* discussion *infra* at 13-14)—once a fee petitioner submits admissible evidence that market rates are higher.

## IV. It is unacceptable under our precedents to cap fees at rates unadjusted in over a decade.

The nationwide Legal Services Price Index, the authoritative economic metric compiled by the U.S. Bureau of Labor Statistics, has risen from 194.4 in June 2014 to 288.5 in February 2024, the latest month for which actual figures are available.[2] That represents a 45%

---

[2] Table available at https://data.bls.gov/timeseries/PCU5411--5411--?amp%253bdata_tool=XGtable&output_view=data&include_graphs=true (last visited August 4, 2024).

average increase in legal services rates across the country, from the most urban to the most rural, in the ten years since Appendix B was last updated.

Although Maryland's geographical regions run that gamut, a fact that presumably prompted the Appendix B drafters to suggest a range of hourly rates, it remains true that after a decade of rising prices—both overall and in legal services particularly, in every region of the country, and regardless of population density—the Appendix B rates are no longer in touch with economic reality. By restricting fee petitioners to rates that are a decade out of date even by their own terms, Maryland's federal trial courts are creating an artificial cap that by definition does not exist in the market itself: if that cap reflected the true state of the legal services economy, the price rises reflected in the BLS table would never have occurred.

At least some District of Maryland judges have recognized this in awarding rates higher, indeed significantly higher, than those set out in Appendix B. *See, e.g., Plasterers' Local Union No. 96 Pension Plan v. Perry*, 711 F. Supp. 2d 472, 477-78 (D. Md. 2010) (noting that in the ERISA context, rates have been approved that exceed the guidelines),

*rev'd on other grounds,* 663 F.3d 210 (4th Cir. 2011); *Life Techs. Corp. v.*
*Life Techs. Corp.*, No. 10-cv-3527, 2012 WL 4748080, at *2 (D. Md. Oct.
2, 2012) (finding rates "still higher than the guidelines ranges in
Appendix B" reasonable due to the expertise and skills of counsel);
*Astornet Techs., Inc. v. BAE Systems, Inc.*, 201 F. Supp. 3d 721, 730-31
(D. Md. 2016) (approving above-guideline rates).

U.S. District Judge Titus specifically noted that the Appendix B
"guidelines are non-binding." *Astornet Technologies*, 201 F. Supp. 3d at
730. Similarly, U.S. District Judge Davis concluded that "under the
circumstances of this case, a limitation on hourly rates to those
recommended in this district's guidelines would result in unwarranted
unfairness." *Stone v. Thompson*, 164 F. Supp. 2d 639, 640 (D. Md. 2001).

This Court has agreed. "[D]istrict courts are not required to follow
any particular fee matrix." *Harwood v. American Airlines, Inc.*, 37 F.4th
954, 961 (4th Cir. 2022). A fee matrix or table is merely a "useful
starting point to determine fees, not a required referent." *Newport News*
*Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 251 (4th Cir.
2004). And yet in case after case, District of Maryland judges are
imposing Appendix B rates as a ceiling, ignoring this Court's

pronouncements and effectively refusing to take actual evidence.

The District Court here compounded its clear errors of fact in this regard when it purported to "find" that inflation justified nothing more than the "high end" of the decade-old Appendix B rates. *See* Dist. Ct. Op. at 5, JA809. This improperly assumed that the Appendix B figures themselves were evidence of the toll inflation took on them, a decade after they were set forth in the table. The District Court did not even mention legal services inflation rates, even though they are easy to locate and may even be judicially noticed (*see* Bureau of Labor Statistics data, *supra* at 11 n.2). Such a "finding" in effect defies the facts. It is contrary to reason as well as law.

In contrast, in Washington, D.C. – a legal job market in which many Maryland lawyers routinely practice, just as many D.C. lawyers also practice in Maryland – there are two matrices for determining attorneys' fees. *Salazar v. District of Columbia*, 809 F.3d 58, 63-65 (D.C. Cir. 2015) (discussing the two matrices). This Court can take judicial notice that both matrices are adjusted *each year* to account for the annual inflation in the market for legal services. The "Fitzpatrick" matrix, formerly known as the "Laffey" matrix, is updated annually and

published by the U.S. Attorney's Office for the District of Columbia. *See* Fitzpatrick matrix (attached hereto as Exhibit 2). The "LSI-Salazar" matrix, which is required by statute to be applied to wage and hour claims brought under the D.C. Wage Payment and Collection Law, D.C. Code Ann. § 32-1308(b)(1), is also updated annually by an economist. *See* LSI Salazar matrix (attached hereto as Exhibit 3).

As set forth in the attached spreadsheet, which compares the 2014 rates with the 2024 rates, the Fitzpatrick rates increased by an average of 164.51 percent in that period, and the LSI Salazar rates increased by an average of 136.91 percent in that period (the difference is largely because the Laffey/Fitzpatrick matrix had lagged the legal services market rates, so 2014 was a lower baseline). *See* Spreadsheet, 2014 and 2024 matrices (attached hereto as Exhibit 4). In contrast, the Appendix B rates have remained unchanged for the same period.

Given the lower court's refusal to depart from Appendix B, this Court must consider how little evidence of market rates a trial court may permit itself to consider as a basis for a fee award—and for how long it may continue to rely on old boilerplate rates after inflation has ravaged them—before the judicial function to take and weigh evidence

is entirely replaced by supposition. Even if a Maryland court may think that D.C. market rates are too high for Maryland, such a belief cannot supplant actual evidence of what fees—again, in the market outside fee-shifting cases—actually are at the time of the individual petition.

## CONCLUSION

For the foregoing reasons, amici urge this Court either (a) to invalidate the rates in Appendix B altogether, as so outdated that its guidelines are no longer rational, or (b) to hold that it is reversible error to treat those guideline rates as a ceiling, to reject sworn evidence at variance with those rates, and to ignore the admonition of Appendix B itself that its rates are non-binding.

Respectfully submitted,

_____          _____
Stephen B. Pershing                Alan R. Kabat
Fourth Circuit Bar No. 62418       Fourth Circuit Bar No. 46823
Kalijarvi, Chuzi, Newman & Fitch   Bernabei & Kabat
818 Connecticut Ave., N.W., Ste. 1000  1400 16th Street, N.W., Ste. 500
Washington, D.C. 20006             Washington, D.C. 20036
(202) 331-9260                     (202) 745-1942
spershing@kcnlaw.com               kabat@bernabeipllc.com

Counsel to *Amici Curiae* Metropolitan Washington
Employment Lawyers' Association
and Public Justice Center

August 21, 2024

## CERTIFICATE OF SERVICE

I certify that on this 21st day of August, 2024, I caused the foregoing brief to be filed with the Court's electronic filing system, through which it was transmitted to all counsel of record.

*Alan R. Kabat*

_____

Alan R. Kabat

## CERTIFICATE OF WORD COUNT

I certify that the foregoing brief consists of 3,189 words, not including the Table of Contents or the Table of Authorities, and that it was prepared in Century Schoolbook 14 point font.

*Alan R. Kabat*

_____

Alan R. Kabat